**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cornele A Overstreet,<br><br>               Petitioner,<br><br>v.<br><br>Absolute Healthcare,<br><br>               Respondent. | No. CV-22-00361-PHX-GMS<br><br>**ORDER** |

Before the Court is a Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act, As Amended (Doc. 1), brought by Cornele A. Overstreet, Regional Director of the Twenty-Eighth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board (the "Regional Director"). For the following reasons, the Petition for Temporary Injunction is granted in part and denied in part.

## BACKGROUND

Absolute Healthcare ("Respondent") operates several medical marijuana dispensaries in Arizona.[1] One of Respondent's dispensaries is located in Gilbert, Arizona. Respondent's operations are heavily regulated by the state of Arizona and local

---

[1] Relevant factual background is drawn from the record developed by the Administrative Law Judge ("ALJ") in *Absolute Healthcare D/B/A Curaleaf Arizona*, No. 28-CA-267540, whose decision is currently before the National Labor Relations Board ("the Board"). (R. at 349.)

1    municipalities.  (R. at 92.)  As relevant here, Respondent must ensure that every patient
2    who enters its dispensaries is licensed to purchase medical marijuana.  Medical marijuana
3    patients in Arizona are entitled to an allotment of 2.5 ounces every fourteen days.  (R. at
4    100.)  State regulations require Respondent to confirm that each patient does not purchase
5    more medical marijuana than their allotment allows, and to accurately document changes
6    in each patient's allotment in a state-operated database.  *Id.*

7         Anissa Keane ("Ms. Keane") was a sales associate employed by Respondent at the
8    Gilbert dispensary for approximately three years, ending in August 2020.  In her role, Ms.
9    Keane sold medical marijuana to Respondent's patients.  (R. at 48.)  Ms. Keane was also a
10   union organizer.  She first explored organizing her workplace in November 2019.  After
11   speaking with a representative from United Food and Commercial Workers Local 99, Ms.
12   Keane became the principal campaigner at the Gilbert dispensary.  *Id.*  Ms. Keane spoke
13   with most of her coworkers about unionizing.  (R. at 50.)  These conversations focused on
14   what unionization would entail, and how unionization might improve what some
15   employees viewed as substandard COVID-19 safety protocols.  (R. at 50–51.)

16        Respondent first became aware of Ms. Keane's efforts on July 6, 2020.  Tyler Neier
17   ("Mr. Neier"), the General Manager in Gilbert, emailed Stephanie Cade ("Ms. Cade"),
18   Respondent's Director of Human Resources for Arizona, informing her that "Anissa Keane
19   has been talking to some of the associates about unionizing the dispensary and asking them
20   if they would sign a petition."  (R. at 246.)  Ms. Cade forwarded Mr. Neier's email to Greg
21   Fredericks, the VP of Human Resources for the West Coast, who inquired whether the
22   Gilbert managers had been trained on "Union Avoidance."  (R. at 243–44.)  Ms. Cade
23   indicate the training had been given in January.  (R. at 243.)  Amanda Hargreaves ("Ms.
24   Hargreaves"), another HR executive, asked Ms. Cade to gather additional information,
25   including how Mr. Neier learned the information, what had been said, and the attitude of
26   the employee delivering the news.  (R. at 243.)

27        According to Mr. Neier, an employee named J.G.[2] had informed Kaitlin Cook ("Ms.

28   _____
     [2] The Court will abbreviate the names of non-management employees other than Ms.
     Keane.

Cook), an Assistant Store Manager, that Ms. Keane had asked him to "sign a petition and he said no." (R. at 239.) J.G. indicated that another employee also supported the union, and that Ms. Keane was promoting unionization as leading to higher wages and better benefits for sales associates. *Id.* By Mr. Neier's estimate, as many as nine of the thirty-six dispensary employees could have been in favor of unionizing. (R. at 240.) Ms. Cade relayed Mr. Neier's message to Ms. Hargreaves. (R. at 236.)

On July 11, 2020, Ms. Cook informed Ms. Cade and other members of management that she had obtained greater detail on Ms. Keane's efforts. According to Ms. Cook, Ms. Keane sought:

- Pay be raised to $18/hr including tips

- They would like to be paid Hazard Pay and back hazard Pay for the last couple of months

- She is saying they can get better insurance for only $10 a paycheck

- They would like some control over the products that we carry, I am not sure what she means exactly but [I] would assume she would like to bring in new brands?

- The last thing she mentioned was wanting Tranica Reilly to take management classes, again I am not exactly sure what she means here just relaying the information I was given.

(R. at 228.) Ms. Cook also relayed that Ms. Keane told an employee that she had "12 of 18 required signatures." *Id.* In a subsequent affidavit, Ms. Keane indicated she had actually obtained only four signatures by the end of July 2020. (R. at 367.)

Ms. Keane subsequently sent a detailed information sheet to her coworkers via text message. (R. at 59.) The information sheet, which answered questions about the unionization process, potential benefits, how grievances would be handled, and the role of union cards, was subsequently sent to Mr. Neier, who relayed it to Ms. Cade and other members of Respondent's management on July 27, 2020. On July 29, Bryce Skaggs ("Mr. Skaggs"), another Assistant Store Manager in Gilbert, emailed all Gilbert employees about two "Union meeting[s]" scheduled for Friday July 31 in the morning and the afternoon.

(R. at 230.)  "[E]veryone except the new temps" needed to attend one of the two.  *Id.*  Mr. Skaggs sent an email just after midnight on July 31, reminding employees to attend one of the "Union mandatory meeting[s]" that day.  (R. at 231.)

The ALJ, weighing competing testimony, determined that Ms. Cade made several statements at the morning meeting which were "designed to sway employees away from supporting the Union."  (R. at 354.)  Ms. Keane testified that Ms. Cade told the gathered employees that if they formed a union, they would lose their tips.  (R. at 61.)  Ms. Keane also testified that Ms. Cade promised employees better discounts on marijuana in response to employee concerns about hazard pay.  (R. at 62.)  Ms. Keane finally testified that Ms. Cade implied "that the person trying to organize the Union was just trying to get a job with the Union because she would get paid more."  (R. at 62.)  While Ms. Cade denied making the statements about losing tips and employee discounts, the ALJ found Ms. Keane's testimony to be more credible because Ms. Cade's testimony that the July 31 meeting was not mandatory was contradicted by the documentary record.  (R. at 356.)

Ms. Keane was terminated almost a month later.  The stated reason for her termination was that she had accrued enough disciplinary violations to warrant termination under Respondent's progressive discipline policy.  Under the progressive discipline policy set forth in Respondent's Employee Handbook, employees received a verbal warning for their first infraction.  After a second infraction, employees received a written warning.  A third infraction would result in a final written warning, after which point an employee faced termination.  (R. at 326.)  Ms. Cade characterized the policy as "you get three chances with us and then it results in termination after that."  (R. at 38.)  On August 23, Ms. Cook "informed [Ms.] Keane that she violated the cash handling policy and that she had a $20 discrepancy" in her register drawer.  (R. at 354.)  While Ms. Keane—who had been written up twice before for other infractions—asked whether she would be terminated, Ms. Cook told her she "would need to have at least four cash handling problems to be fired."[3]  (R. at 354.)

---

[3] Respondent contends Ms. Keane also received a verbal warning for a cash-handling error on April 10, 2020.  (R. at 73.)  Ms. Keane denied receiving such a warning.  *Id.*

On August 28, Ms. Keane met with Ms. Cade at the Gilbert location.  (R. at 63.) Ms. Cade informed Ms. Keane that she was terminated.  (R. at 64.)  Ms. Keane told her what Ms. Cook had said about a disciplinary policy specific to cash-handling violations, and Ms. Cade denied the existence of such a policy.  (R. at 64.)

Ms. Keane subsequently filed an Unfair Labor Practice ("ULP") charge against Respondent on October 13, 2020.  (R. at 375.)  The charge was amended on December 28, 2020.  (R. at 378.)  The ALJ held a hearing on June 15 and 16, 2021.  (R. at 349.)  In an order issued on February 8, 2022, the ALJ concluded that Respondent violated the National Labor Relations Act (the "Act") as follows:

> 1. Respondent's actions of terminating [Ms. Keane] violated Section 8(a)(3) and (1) of the Act.
>
> 2. Respondent's threat to employees that they would lose their tips if they formed a union violated Section 8(a)(1) of the Act.
>
> 3. Respondent's promise of benefits to employees if they did not form a union violated Section 8(a)(1) of the Act.
>
> 4. Respondent's actions created an impression of surveillance when it singled out the sole female organizer and violated Section 8(a) (1) of the Act.

(R. at 359.)  Respondent has filed exceptions to the ALJ's decision, and the matter is presently pending before the Board.

## DISCUSSION

### I.     Legal Standard

The Regional Director seeks an injunction pursuant to Section 10(j) of the Act pending final disposition of the administrative proceeding before the Board.  Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have

jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

"To decide whether granting a request for interim relief under Section 10(j) is 'just and proper,' district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010); *see also Frankl v. HTH Corp. (HTH Corp. I)*, 650 F.3d 1334, 1355 (9th Cir. 2011). Consequently, the Regional Director must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

## II.     Analysis

### A.     Likelihood of Success on the Merits

For purposes of a § 10(j) petition, "likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that [the Ninth Circuit] would grant a petition enforcing that order." *HTH Corp. I*, 650 F.3d at 1355. Where, as here, approval to file the § 10(j) petition was given by the General Counsel and not the Board itself, the mere fact of the petition's filing is not relevant to evaluating the Regional Director's likelihood of success. *Id.* at 1356. However, it remains "necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. at 20. "[E]ven on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel." *Id.* (quoting *Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union*, 494 F.2d 1230, 1245 (2d Cir. 1974)). Likewise, "[a] conflict in the evidence does not preclude the Regional Director from making the requisite showing for a [§] 10(j) injunction." *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 662 (9th Cir.

2001), *abrogated on other grounds as recognized in Ampersand Publ'g*, 593 F.3d at 957. The Regional Director therefore carries his burden if he can "produce[] some evidence to support the unfair labor practice charge, together with an arguable legal theory." *HTH Corp. I*, 650 F.3d at 1356 (quoting *Cal. Pac. Med. Ctr.*, 19 F.3d at 460); *see also Coffman v. Queen of the Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018).

### 1.    Uncontested Violations

Under § 8(a)(1) of the Act, it is an unfair labor practice if an employer "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of" the employees' rights under § 7 of the Act to self-organize, engage in union activity, collectively bargain, and engage in concerted activity.   29 U.S.C. § 158(a)(1); *id.* § 157.   The ALJ concluded that Respondent violated § 8(a)(1) by: (1) promising "improved discounts at the Union Mandatory Meeting," (2) threatening that the employees would lose tips if they unionized, and (3) creating an impression of surveillance by suggesting that management was monitoring Ms. Keane's unionization efforts.   (R. at 355–57.)   Because Respondent concedes Ms. Cade's comments amount to violations of § 8(a)(1), the Court assumes that the Regional Director is likely to succeed before the Board on each of the three alleged § 8(a)(1) violations.  (*See* Doc. 15 at 21–22, 29, 21 n.22.)

### 2.    Ms. Keane's Discharge

Under § 8(a)(1) and (3) of the Act, it is an unlawful labor practice for an employer to discipline or terminate an employee in order "to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3); *Frankl v. HTH Corp. (HTH Corp. II)*, 693 F.3d 1051, 1062 (9th Cir. 2012) ("An employer violates Section 8(a)(3) when the employee's involvement in a protected activity was a substantial or motivating factor in the employer's decision to discipline or terminate the employee.").   The Board utilizes a burden-shifting framework first set forth in *Wright Line*, 251 NLRB 1083 (1980) to evaluate § 8(a)(3) violations.  *See Tschiggfrie Props., Ltd.*, 368 NLRB No. 120, at *5 (2019).  First, the Regional Director must show that Ms. Keane's union activities were a motivating factor in Respondent's decision to terminate her. *Wright Line*, 251 NLRB at

1089.  The elements of such a showing are (1) "union or other protected concerted activity by the employee," (2) "employer knowledge of that activity," and (3) "animus on the part of the employer."  *Electrolux Home Prods.*, 368 NLRB No. 34, at *3 (2019).  Then, the "burden shifts to the Respondent to establish that it would have discharged [Ms. Keane] for a legitimate, nondiscriminatory reason regardless of [Ms. Keane]'s union activity." *Tschiggfrie*, 368 NLRB No. 120, at *5.  "An employer cannot prove this affirmative defense where its 'asserted reasons for a discharge are found to be pretextual.'"  *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 779 (9th Cir. 2017) (quoting *In re Stevens Creek Chrysler Jeep Dodge, Inc.*, 357 NLRB 633, 637 (2011)).

Defendant does not contest that the Board is likely to conclude that (1) Ms. Keane engaged in union activity when she attempted to organize her workplace, and (2) Respondent knew about her actions.  (Doc. 15 at 22.)  Therefore, the issues are whether the Regional Director is likely to succeed in showing animus, and whether the Board is likely to conclude that Respondent's proffered reason for terminating Ms. Keane was pretextual.

### a.     Animus

Proof of animus may be based on "direct evidence or, under certain circumstances, it may be inferred from circumstantial evidence based on the record as a whole."  *Boar's Head Provisions Co., Inc.*, 370 NLRB No. 124, slip op. at 25 (2021); *Electrolux*, 368 NLRB No. 34, at *3.  Factors supporting an inference of animus include "the timing of the adverse action in relation to the protected activity, other unfair labor practices committed, respondent's reliance on pretextual or shifting reasons to justify the adverse action, disparate treatment of members based on protected activity and a respondent's deviation from past practice."  *Laborers' Int'l Union of N. Am., Local Union No. 91 (Scrufari Constr. Co., Inc.)*, 370 NLRB No. 42, slip op. at 9 (2020).  The Board has recently clarified that "evidence of the Respondent's general hostility toward the Union is not sufficient" to satisfy this element.  *Tschiggfrie*, 368 NLRB No. 120, at *5.  Instead, the evidence of animus must support "a causal relationship . . . between the employee's protected activity

and the employer's adverse action against the employee." *Id.* at *11.

The Regional Director argues the Board is likely to adopt the ALJ's conclusion that sufficient evidence of animus existed in the administrative record.  (Doc. 1-1 at 27.)  The ALJ based its conclusion on four grounds: (1) Ms. Cade's comment at the mandatory meeting that the organizer of the union was trying to get a "job with the union because she would get paid more," (R. at 354), (2) the three uncontested § 8(a)(1) violations, (R. at 358), (3) that Ms. Keane was discharged "less than a month after" the mandatory meeting, (R. at 358), and (4) evidence of Ms. Keane's disparate disciplinary treatment.  (R. at 358.)

The Board is likely to find animus on the administrative record.  As for Ms. Cade's comment, the ALJ concluded that it amounted to singling out Ms. Keane for her organizing efforts and maligning her motivations.  (R. at 358.)  Ms. Cade's comment readily lends itself to an interpretation consistent with the ALJ's conclusion: that Ms. Keane's efforts to organize her workplace were not so she could reap the rewards of higher wages as Respondent's employee, but that she hoped a successful union election would lead to her being hired by the union in the future.  The implication is that Ms. Keane's efforts were to further her personal interests and not necessarily those of her coworkers.  As the comment relates directly to Ms. Keane's protected activity, the Board could infer that it amounted to an attempt to persuade her coworkers to be skeptical of her outreach and therefore tends to show that Respondent not only exhibited animus towards unions generally, but towards Ms. Keane's efforts specifically.

The uncontested § 8(a)(1) violations likewise weigh in favor of finding animus.  While the Board has found that contemporaneous ULPs are insufficient to show animus if they merely reflect hostility towards unions generally, *see Boar's Head*, 370 NLRB No. 124, slip op. at 26, the ULPs in this case are likely to be considered sufficiently related to Ms. Keane's protected activity.  *See Tschiggfrie Props.*, 368 NLRB No. 120, at *5 (noting that the inquiry should focus on animus towards the disciplined or discharged employee's "specific union activity").  All three violations took place at a mandatory meeting specifically called in response to Ms. Keane's efforts to organize her workplace.  As the

record reflects that Ms. Keane was the driving force behind the union drive, the Board is likely to conclude that had Ms. Keane not attempted to organize her coworkers, the comments would not have been made.  Therefore, the contemporaneous ULPs have a sufficient causal nexus to Ms. Keane's specific protected activity that the Board is likely to consider them evidence of animus.

As for the timing of Ms. Keane's discharge, this factor is somewhat weaker but still weighs in favor of animus.  The Board considers discharge within days of protected activity to be strongly probative of animus.  *See Napleton Cadillac of Libertyville*, 367 NLRB No. 6, slip op. at 15 (2018) (finding termination nine days after union election strongly probative of animus); *Velox Express, Inc.*, 368 NLRB No. 61, slip op. at 29 (2019) (finding employee's discharge three days after protected activity was "sufficient to meet the General Counsel's initial burden" of showing animus).  Here, however, Ms. Keane was discharged on August 28, 2020, while the mandatory meeting took place on July 31 and Respondent first learned of her protected activity on July 6.  Therefore, this case is more akin to *Mondelez Global, LLC*, 369 NLRB No. 46, at *2 (2020).  In *Mondelez*, the employees engaged in protected activity and were terminated "a few months" later.  369 NLRB No. 46, at *2.  The Board held that "[t]his temporal proximity provides some evidence of a causal link between the employees' union activities and their loss of employment" but was not conclusive.  *Id.*  As Ms. Keane's discharge took place almost a month after the mandatory meeting and almost two months after Respondent first learned of her protected activity, the Board is likely to conclude that the timing of her discharge provides "some evidence of a causal link" but is not sufficient to show animus standing alone.  *Id.*

The Regional Director finally argues the Board will find animus because Ms. Keane was subjected to disparate disciplinary treatment.  *See In re Golden State Foods Corp.*, 340 NLRB 382, 385 (2003) (finding evidence of disparate disciplinary treatment relevant to a finding of animus).  The ALJ concluded that Ms. Keane was treated differently than T.H., a sales associate terminated in 2019.  (R. at 358.)  T.H. received his first written warning on April 23, 2019, for cash drawer discrepancies on three different dates.  (R. at 262.)  He

1    received his final written warning on May 1, 2019, which listed two additional dates with

2    cash discrepancies in addition to the three listed in the first written warning. (R. at 261.)

3    T.H. was ultimately discharged in June 2019 for a $20 discrepancy on June 11, 2019. (R.

4    at 260). Ms. Keane received her first written warning on April 28, 2020, for seven distinct

5    errors in processing a single customer transaction. (R. at 284.) Ms. Keane's final written

6    warning came on July 17, 2020—after Respondent became aware of her protected

7    activity—for allowing a patient to purchase marijuana with an expired medical card, and

8    for processing the transaction under the wrong patient profile. (R. at 286). Finally, Ms.

9    Keane was terminated on August 28, 2020 because of a $20 discrepancy in her cash drawer.

10          While Ms. Keane was terminated after four infractions consistent with Respondent's

11   written progressive discipline policy, the Regional Director contends she was treated

12   disparately because each written warning occurred after a single erroneous transaction—

13   while T.H.'s warnings encompass infractions spanning several transactions—and because

14   she was terminated after only a single cash-handling incident. (Doc. 1-1 at 27–28.) Ms.

15   Cade's testimony that it takes "four incidents" for an employee to be terminated, (R. at

16   154), is inconsistent with T.H.'s disciplinary records, which suggest that he was terminated

17   after violating Respondent's cash-handling policy six different times. (R. at 260–62.)

18   Likewise, her testimony that an employee advances along the stages of Respondent's

19   progressive discipline policy regardless of the type of infraction is contradicted by two

20   pieces of evidence in the administrative record. (R. at 154.) First, Ms. Keane—who the

21   ALJ found more credible than Ms. Cade[4]—testified that Ms. Cook told her that she "would

22   have to have at least four cash-handling problems" before she was terminated. (R. at 64,

23   358.) Second, Mr. Neier indicated in an email written after Ms. Keane's $20 discrepancy

24   was discovered in August that "[n]ormally we do a verbal warning and then written with

---

[4] An ALJ's credibility finding will be upheld unless it is "inherently incredible or patently unreasonable." *New Breed Leasing Corp. v. NLRB*, 111 F.3d 1460, 1465 (9th Cir. 1997) (quoting *Retlaw Broad Co. v. NLRB*, 53 F.3d 1002, 1005 (9th Cir. 1995)). The ALJ determined Ms. Keane was more credible because Ms. Cade's testimony was directly contradicted by the documentary record on at least one occasion. (R. at 356.) As this determination was supported by the record, the ALJ's credibility finding will likely be upheld by the Board and the Ninth Circuit.

cash discrepancies specifically." (R. at 256.)  This further supports the Regional Director's argument that cash-handling incidents were treated differently from other types of disciplinary infractions, and that Ms. Keane was treated more harshly for cash-handling violations than a comparator employee who did not engage in protected activity.

While the Regional Director's interpretation of the evidence is not the only possible one, he need only present "some evidence" and "an arguable legal theory" supporting the ALJ's conclusion.  *HTH Corp. I*, 650 F.3d at 1356.  As he has done so, he has met his burden to show he is likely to succeed before the Board in establishing his prima facie case.

### b.    Legitimate Nondiscriminatory Reason for Termination

To rebut the Regional Director's prima facie case, Respondent must show by a preponderance of the evidence that "it would have discharged [Ms. Keane] for a legitimate, nondiscriminatory reason regardless of [Ms. Keane]'s union activity."  *Tschiggfrie Props.*, 368 NLRB No. 120, at *5.  "In other words, a respondent must show that it *would* have taken the challenged adverse action in the absence of protected activity, not just that it *could* have done so."  *Rhino Nw., LLC*, 369 NLRB No. 25, at *3 (2020).  Respondent argues that it would have terminated Ms. Keane regardless of her protected activity because Respondent operates in a highly regulated environment, and her infractions threatened Respondent's license to operate medical marijuana dispensaries.  (Doc. 15 at 27.)  The Regional Director notes that Respondent's disparate treatment of Ms. Keane and T.H. undermines this assertion, as Respondent was arguably more lenient with T.H. than Ms. Keane.  (Doc. 17 at 11.)

The Board is likely to conclude that Respondent has not shown that it would have discharged Ms. Keane had she not engaged in protected activity.  The ALJ found that the "stark evidence of disparate treatment of at least another employee," namely T.H., fatally undermined Respondent's case because it suggested Respondent applied its progressive discipline policies inconsistently against Ms. Keane and T.H.  (R. at 359); *cf. Great Lake Window, Inc.*, 319 NLRB 615, 617–18 (1995) (finding evidence that the respondent's policies were applied "in the same manner to other employees" highly relevant to

determining whether the respondent would have terminated employee absent protected activity).  While the ALJ's decision is "not binding" on the Court, it "serves as a useful benchmark for gauging the Regional Director's likelihood of success on the merits." *HTH Corp. II*, 693 F.3d at 1063.  Moreover, the ALJ's determination is supported by the text of Respondent's progressive discipline policy, which does not mandate termination after four violations, but preserves discretion for Respondent in determining how to discipline its employees.  (R. at 326.)  Therefore, while the Board will likely conclude that Respondent has shown that it *could* have discharged Ms. Keane, Respondent will likely fail to make the more exacting showing that it *would* have.  Because the record contains at least "some evidence" supporting the Regional Director's position that Ms. Keane's discharge was retaliatory in nature, the Board is likely to agree that Respondent has not met its burden to establish by a preponderance of the evidence that it would have terminated Ms. Keane had she not engaged in protected activity.[5]  *Cal. Pac. Med. Ctr.*, 19 F.3d at 460.

### c.    Conclusion

The Regional Director is likely to succeed on the merits because the Board is likely to conclude that Respondent violated § 8(a)(1) and (3) when it terminated Ms. Keane. While Respondent has presented evidence of Ms. Keane's disciplinary issues, the Board could nevertheless conclude that Ms. Keane's discharge was in retaliation for her protected activity.   "That is not the only conclusion the evidence would support, but contrary evidence in the record does not preclude a showing of a likelihood of success on the merits" in a § 10(j) proceeding.  *Overstreet v. David Saxe Prods., LLC*, No. 18-cv-01287-APG-NJK, 2019 WL 332406, at *7 (D. Nev. 2019).

### B.    Likelihood of Irreparable Harm

In § 10(j) cases, "'permit[ting an] allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority' is irreparable harm." *Small v. Operative Plasterers' and Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 483,

---

[5] If Ms. Keane were to accept reinstatement, Respondent remains free to exercise its discretion to discipline her under the terms of its progressive discipline policy, provided it does so without exhibiting anti-union animus.

494 (9th Cir. 2010) (quoting *Cal. Pac. Med. Ctr.*, 19 F.3d at 460).  While irreparable injury may not be conclusively established by a finding of likelihood of success on the merits, "irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."  *HTH Corp. I*, 650 F.3d at 1362.  "In making the latter determination, inferences from the nature of the particular unfair labor practice at issue remain available."  *Id.*

As both parties focus their analysis on Respondent's termination of Ms. Keane, the Court does so as well.  "[T]he discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process."  *HTH Corp. I*, 650 F.3d at 1363 (quoting *Pye v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001)).  Doing so "sends a message that the employer will take action against union supporters, which adversely impacts employee interest in and support of unionization."  *HTH Corp. II*, 693 F.3d at 1066.  Ms. Keane was the main organizer at Respondent's Gilbert location.  (R. at 351, 371.)  As the record does not show that any other employees were distributing union cards or otherwise attempting to organize their workplace, her termination necessarily hindered the union drive and "largely establishes likely irreparable harm, absent unusual circumstances."  *HTH Corp. I*, 650 F.3d at 1363.

Respondent argues there is no likelihood of irreparable harm because there is no evidence any significant number of employees supported the union, the Regional Director's delay in bringing the § 10(j) petition shows that an interim injunction pending a Board decision is unnecessary, and Ms. Keane does not intend to organize her workplace even if she were reinstated.  (Doc. 15 at 32.)  As for Respondent's first contention, its argument is difficult to separate from the ALJ's uncontested finding that Respondent committed three ULPs in a series of mandatory meetings held mere days after learning about the details of Ms. Keane's pitch to her fellow employees.  Even before Ms. Keane was discharged, Respondent had attempted to chill unionization efforts.  It cannot now use

the lack of union support among its employees to argue an injunction is unwarranted. *See HTH Corp. I*, 650 F.3d at 1365 ("[I]n the context of pervasive unremedied unfair labor practices, it becomes impossible to know if employees truly no longer want representation by the elected union, as their expressed preferences are generally tainted by the effects of the unfair labor practices.").

Second, the Ninth Circuit expressly rejected a delay argument similar to Respondent's in *HTH Corp. I*. There, the ALJ issued his decision on September 30, 2009, but the Regional Director did not file a § 10(j) petition until January 7, 2010. *HTH Corp. I*, 650 F.3d at 1341. The court found the delay did not weigh against finding likely irreparable harm because "[b]y awaiting the ALJ decision, the Director made the District Court's task in evaluating the propriety of interim relief much easier, and much more likely to be carried out accurately" because the court could rely on the full record developed by the ALJ in arriving at its conclusions. *Id.* at 1363. Here, the ALJ issued his decision on February 8, 2022, and the Regional Director filed the § 10(j) petition on March 9, 2022—much faster than in *HTH Corp. I*. Therefore, the Regional Director's delay does not weigh against finding likely irreparable harm.

That Ms. Keane does not necessarily intend to organize her workplace again if she were offered reinstatement is likewise of little weight. Even if Ms. Keane returns to work for Respondent but does not organize her colleagues, her return would signal to other employees that they are free to self-organize under the auspices of the Act. *See David Saxe Prods*, 2019 WL 332406, at *9 n.4 ("Requiring an offer of reinstatement is not just about making the discharged employees whole. It also sends a message to other employees that retaliatory discharges will be redressed."). Moreover, Ms. Keane testified at her deposition that if offered reinstatement, she would only work for Respondent until she finished her graduate studies in May 2023. (Doc. 15-1 at 5, 6.) "[A] long time may pass before the Board decides the merits of this case," and there is no guarantee that the Board will issue its decision before May 2023. *Pye v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001). If the Board issues a reinstatement order after May 2023 but no temporary injunction is in

place, its remedial authority would be "render[ed] meaningless." *HTH Corp. I*, 650 F.3d at 1362; *Small*, 611 F.3d at 494 (allowing "allegedly unfair labor practice[s] to reach fruition" amounts to "irreparable harm"). Consequently, the Regional Director has met his burden to show a likelihood of irreparable harm.

### C.    Balance of Equities

In considering the balance of equities in § 10(j) cases, the Court "must take into account the probability that declining to issue the injunction will permit the alleged[] unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority." *HTH Corp. I*, 650 F.3d at 1365 (quoting *Cal. Pac. Med. Ctr.*, 19 F.3d at 460). A finding of likely irreparable harm suggests there is "considerable weight" on the Regional Director's side of the balance of equities. *Id.*

Respondent argues it would be harmed by an order that Ms. Keane be reinstated because Ms. Keane's history of infractions suggest she is a "poor performer" who is likely to continue making errors that could jeopardize Respondent's license to operate a medical marijuana dispensary. (Doc. 15 at 33.) This argument is not without merit. As detailed above, Respondent operates in a highly regulated environment, and Ms. Keane was twice disciplined for transactions that likely violated state regulatory requirements. However, this harm must be weighed against the Court's determination that the Board is likely to conclude that Ms. Keane's ultimate termination was motivated by animus against her protected activity and that she was disciplined more harshly than peer employees. Moreover, if Ms. Keane were to accept reinstatement, Respondent would be free to monitor and discipline her like any other employee, so long as it does not exhibit anti-union animus in doing so.

Respondent also argues it would be harmed if the Court ordered one of Respondent's employees to read the Court's order at a mandatory staff meeting. This argument has been considered and rejected by the Ninth Circuit, because "a reading order is not an extraordinary remedy but rather an 'effective but *moderate* way to let in a warming wind of information and, more important, reassurance.'" *United Nurses*, 871 F.3d at 789

(quoting *UNF W., Inc. v. NLRB*, 844 F.3d 451, 463 (5th Cir. 2016)). "Public notice reading in particular is designed to 'ensure that the important information set forth in the notice is disseminated to all employees, including those who do not consult the [employer's] bulletin boards.'" *UNF*, 844 F.3d at 463 (quoting *Excel Case Ready*, 334 NLRB 4, 5 (2001)). However, mindful of Respondent's concerns, the Court will require an agent of the Board to read the order at mandatory employee meetings scheduled by Respondent. This cures any question of compelled speech, as "it is obvious from this order that [Respondent does] not agree with or support the positions of the [Regional Director.]" *David Saxe Prods.*, 2019 WL 332406, at *9.

Having considered both parties' arguments, the Court concludes the equities weigh in favor of issuing an injunction as Respondent's harms from an injunction are outweighed by its alleged violations of the Act and the importance of interim relief.

### D.      Public Interest

As for the final factor, the "public interest is served by ensuring that an unfair labor practice will not continue while the Board takes time to investigate and adjudicate the charge." *HTH Corp. II*, 693 F.3d at 1066. Respondent argues this factor weighs against an injunction because it did not violate the Act by discharging Ms. Keane, and an injunction is inappropriate to remedy its other three violations of the Act. However, the Court has determined that the Board is likely to disagree with Respondent and conclude Ms. Keane's discharge was unlawful. And absent an injunction, Respondent's likely violations of the Act may go unremedied because of administrative delay. "[E]nforcement of the ALJ's order" therefore "serves the public interest" as it preserves the Board's remedial power. *Id.*

### E.      Scope of Injunction

The Regional Director has shown a likelihood of success on the merits, a likelihood of irreparable injury, and that the balance of hardships and the public interest favor interim injunctive relief. The Court must therefore consider what relief is "just and proper" under the circumstances. 29 U.S.C. § 160(j). As "[a]n overbroad injunction is an abuse of

discretion," the Court must tailor its order "to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).

The proposed injunctive relief contains aspects that are prohibitory and aspects that are mandatory.  (Doc. 1 at 9.)  A prohibitory injunction prevents a party from taking action and "preserve[s] the status quo," while a mandatory injunction orders a party to take action and goes beyond maintaining the status quo.  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009).  Mandatory injunctions are not granted unless "extreme or very serious damage will result" and are not granted in "doubtful" cases or where the injury is compensable in damages.  *Id.* at 879.  "The rules governing the relief that may be granted by preliminary injunction are not 'hard and fast rules, to be rigidly applied to every case regardless of its peculiar facts,' because '[t]he infinite variety of situations . . . requires that the court have considerable discretion in fashioning such relief.'"  *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)).

The Regional Director seeks an injunction requiring Respondent to (1) offer Ms. Keane reinstatement, (2) remove all records relating to her discharge, (3) hold one or more mandatory meetings at the Gilbert location where the Court's order will be read to the assembled employees by either a member of Respondent's management or a Board official, (4) post copies of the Court's order in the Gilbert facility, and (5) submit an affidavit documenting compliance with the Court's order.  While the Court must scrutinize proposed mandatory relief closely, the proposed terms meet the heightened standard.  Courts reviewing § 10(j) petitions regularly recognize reinstatement and notice-reading are appropriate remedies for a likely § 8(a)(3) violation.  *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 931–32 (D. Ariz. 2014) (reinstatement and notice-reading); *Frankl v. Adams & Assocs., Inc.*, 74 F. Supp. 3d 1318, 1332 (E.D. Cal. 2015) (reinstatement); *Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1207 (D. Haw. 2010) (reinstatement and notice-reading); *David Saxe Prods.*, 2019 WL 332406, at *19 (reinstatement and notice-reading).

Moreover, "[m]andatory injunctions are most likely to be appropriate when 'the status quo . . . is exactly what will inflict the irreparable injury upon complainant.'" *Hernandez*, 872 F.3d at 999 (quoting *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984)).  The provisions of the Regional Director's relief that are mandatory in nature are largely required to remedy Respondent's likely violations of the Act.[6]  Accordingly, the Court finds the Regional Director has met his burden for the requested relief.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the Regional Director's Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act, As Amended (Doc. 1) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that pending final disposition of *Absolute Healthcare D/B/A Curaleaf Arizona*, No. 28-CA-267540 before the Board, Respondent and its officers, agents, servants, representatives, successors, and assigns, and all persons acting in concert with them are hereby **RESTRAINED AND ENJOINED** from:

(a)     creating an impression among its employees that their Union and concerted activities are under surveillance by Respondent;

(b)     threatening its employees with losing their tips if they form a union;

(c)     promising its employees benefits, including better employee discounts, if they do not form a union;

(d)     discharging or otherwise discriminating against employees in order to discourage membership in, or support for, or activities on behalf of the Union and any labor organization;

---

[6] The Court declines to order Respondent to remove all records relating to Ms. Keane's discharge at this time.  The Board will determine in due course whether Ms. Keane's discipline and discharge was motivated by her union activities.  "Purging the files now is premature, especially if the Board finds the discharges and discipline were justified." *David Saxe Prods.*, 2019 WL 332406, at *18.  If Ms. Keane accepts reinstatement, her prior discipline may be considered in any further progressive discipline that she may be subject to, pending a final Board order.

(e)    discharging or otherwise discriminating against employees for engaging in concerted activities protected by Section 7 of the Act; and

(f)    in any like or related manner interfering with, restraining, or coercing its employees in the exercise of their rights to self organization, to form labor organizations, to join or assist the Union or any labor organization, to bargain collectively through representatives of their own choosing and to engage in other concerted activities for the purposes of collective bargaining or other mutual aid or protection, or to refrain from any and all such activities.

**IT IS FURTHER ORDERED** that Respondent shall:

(a)    Within five (5) days of the date this Order is electronically filed, offer, in writing, Ms. Keane interim reinstatement to her former position; or, if that position no longer exists, to a substantially equivalent position without prejudice to seniority or any other rights and privileges previously enjoyed, displacing, if necessary, any employees who may have been hired or reassigned to replace her;

(b)    Within ten (10) days of the date this Order is electronically filed:

    i.   Hold one or more mandatory employee meetings at the Gilbert, Arizona facility, on working time and at times when Respondent customarily holds employee meetings, and scheduled to ensure the widest possible employee attendance, at which the Order will be read to the bargaining unit employees by a Board official;

    ii.   Announce the meeting(s) for the order reading in the same manner it would customarily announce a meeting of employees; and

    iii.   Require that all employees of the unit attend the meeting(s);

(c)    Within five (5) days of the date this Order is electronically filed, post copies of the Order at Respondent's Gilbert, Arizona facility where notices to employees are customarily posted; said posting shall be maintained during the pendency of the Board's administrative proceedings free from all

obstructions and defacements; all unit employees shall have free and unrestricted access to said postings; and

(d)  Within twenty (20) days of the date this Order is electronically filed, file with the Court, with a copy submitted to the Regional Director of Region 28 of the Board, a sworn affidavit from a responsible Respondent official, setting forth with specificity the manner in which Respondent has complied with the terms of this decree, including how it has posted the documents required by this order.

Dated this 23rd day of June, 2022.

G. Murray Snow
Chief United States District Judge